## Breitenbach *versus* Bush.

*Constitutionality of Act of April 1861, authorizing stay of Civil Process against Persons in the Military Service of the United States.*

1. The Act of April 18th 1861, staying civil process against any person in the service of the state or of the United States, for the term of such service, and thirty days thereafter, is constitutional, for the stay is for a definite and limited time, being under the Act of Congress for three years, and under the Act of Assembly for thirty days thereafter.

2. Such stay, under the exigencies of the government existing at the time of the passage of the act, is not unreasonable, especially as the statutes of limitation in favour of the soldier are suspended during his exemption from process.

3. The act gives but one stay, to be computed from the time of the original muster, and a re-enlistment would not renew it.

4. A *levari facias sur mortgage* is "*process*" within the meaning of the act.

5. The remedy of parties aggrieved by the decision of the Court of Common Pleas, on petition for the benefit of the Act 18th April 1861, is by appeal and not by writ of error; for the affidavit of military service is not a part of the record, and is therefore not brought up by writ of error.

ERROR to the Common Pleas of *Montgomery county.*

This was a *scire facias sur mortgage,* sued out in the court below, August 27th 1859, at the suit of James Bush, against John R. Breitenbach.

The mortgage was dated March 30th 1857, and was due April 10th 1857. The suit was arbitrated, and on the 15th of October 1859, there was an award entered for plaintiff, from which the defendant appealed. When the case was reached on the trial list, the following agreement was executed by the parties and filed :—

"And now, to wit, May 21st 1860, it is agreed that judgment shall be entered in the above case, in favour of the above plaintiff, and against the above defendant, for the sum of $4341.05, with costs of suit. Execution to stay until the 1st day of April next. And it is further agreed that the prothonotary shall enter the above judgment."

On the 2d of June 1862, James Bush issued an *alias levari facias* upon the above judgment. There had been a previous stay under the Act of May 21st 1861. On the 16th of June 1862, John R. Breitenbach, by his counsel, filed in court a petition for a rule to show cause why said *alias* writ of *levari facias* should not be stayed and set aside by said court, upon the following facts, to wit, that the said John R. Breitenbach, for several months previous to the issuing of said writ, was legally mustered into the military service of the United States for three years or during the war, and is still in said service as a captain in the 106th regiment, Pennsylvania volunteers. At the time

of the filing of this petition, Captain Breitenbach was with his regiment in Virginia. The court granted the rule, and G. R. Fox, Esq., counsel for Mr. Bush, agreeing to the truth of the facts contained in the petition, the rule was, by consent, made returnable forthwith. After argument the court filed a written opinion discharging the rule. This writ was then sued out by Breitenbach, for whom the judgment of the court below, in discharging the rule to stay and set aside the writ, was assigned for error.

*Charles T. Miller* and *E. A. Banks,* for plaintiff in error, argued—1. That a writ of error lies in this case: Pontius *v.* Nesbit, 4 Wright 309. 2. That the plaintiff in error was entitled to the benefit of the Act of April 2d 1822. The court decided that inasmuch as the defendant below had " volunteered," and was mustered into the service, he cannot receive the protection of the Act of April 2d 1822; that this act is applicable only to those " called" into the service, and that none are " called" but those who are " drafted." We respectfully submit that this is a harsh, unnatural, unreasonable, if not impossible, construction to give this act. The president " calls" for troops. The word " call" means *to invite,* to *request to come.* If we give this act a literal and not a liberal construction, it would be applicable only to " volunteers," because they are the only parties who accept the invitation. Breitenbach is not a " volunteer," in the same sense as a party who enlisted in the army of the United States before the present rebellion broke out. He was called by the president of the United States, and voluntarily responded to the call. For these reasons we think he should have the benefit of the Act of 1822. 3. He also claims the benefit of the 4th section of the Act of April 18th 1861, which provides that no civil process shall issue against any person mustered into the service of the United States during the term for which he shall be engaged in such service. The court below decided that this act is in conflict with sec. 10, art. 1, of the Constitution of the United States, and with sec. 17, art. 9, of the Constitution of Pennsylvania, and is therefore unconstitutional and void. The ground of this decision is that by the act the remedy is postponed for an unlimited and unreasonable period, thus operating as a virtual destruction of the contract. If this were the effect of the act there would be no doubt of its unconstitutionality. But we think such is not the effect of the act. The legislature of Pennsylvania, with a desire to aid the general government, passed the Act of April 18th 1861, so as to encourage volunteering. But they could not fix the " term" of service until they would know how long Congress would authorize the president to call out the militia. They therefore were obliged to pass this act to enable it to be taken

[Breitenbach v. Bush.]

and operate in connection with the Act of Congress, which was passed on the 22d of July 1861 following, by which the president of the United States is authorized to call out 500,000 volunteers to suppress the rebellion: "Provided that the services of the volunteers shall be for such time as the president may direct, not exceeding three years nor less than six months, and they shall be discharged at the end of the war." This Act of Congress and the Act of April 18th 1861 were made for the same purpose and about the same time, and should be construed together. If this is done, the Act of April 18th 1861 will authorize the suspension of an execution against the volunteer in the United States army for a period of three years, unless he be sooner discharged from said service.

In numerous instances the courts of the United States and of this state have decided that the legislature may control and suspend the remedy for a limited and reasonable time. The Act of July 16th 1842 stayed execution for a period of one year, when the debtor's property would not bring two-thirds of its value. The Act of June 16th 1836 exempts after-acquired property of discharged insolvents from execution for seven years. The Act of October 13th 1857 authorizes a stay of execution for one year. See also Chadwick v. Moore, 8 W. & S. 51. The term of service during which the suspension of the remedy continues, is for three years, provided the government is unable sooner to suppress the rebellion. This surely is not an unreasonable time.

*G. R. Fox*, for defendant in error.—1. The defendant was precluded by the agreement of May 21st 1860, from obtaining any further stay of execution. That agreement bound both or neither. It as much prevented the defendant from interposing further delay, after the expiration of the stay agreed on, as it restrained the plaintiff from proceeding until the end of the time limited. The stay granted under the Act of 1861 was therefore illegal, *a fortiori* that asked for here.

2. The former stay was however for a definite time. The defendant, not satisfied with the year's stay allowed on the mortgage by the Act of 1705, and the further stay of a year by the agreement of the plaintiff, and the stay of a third year by virtue of the Act of 1861, now asks that his creditor be compelled to wait for his principal and interest three years longer, and for such further indefinite time as the war may continue, or he may choose, by re-enlistment, to prolong his service.

He cites two Acts of Assembly.

1. Act 2d April 1822, § 70, Digest 595, which is altogether compulsory in its provisions, and has no application to the case of the defendant, who was a volunteer.

2. Act of 18th April 1861, § 4, P. L. 409, which provides

that "no civil process shall issue or be enforced against any person mustered into the service of this state, or of the United States, during the term for which he shall be engaged in such service, nor until thirty days after he shall have been discharged therefrom : *Provided,* That the operation of all statutes of limitation shall be suspended upon all claims against such person during such term."

I. What is civil process? It is this alone with which the act pretends to interfere. This is answered by 3 Black. Com. ch. 19, p. 279.

The law can only mean that no new proceeding shall be instituted against a person in the service. He shall not be compelled to appear constructively, when it is impossible for him to appear actually. He shall not be liable to have his rights tried and determined without notice, and an opportunity to defend. But the act does not and cannot apply to a case in which the process has been executed; the party has come into court in obedience to it, has had his rights adjudicated, and the only thing remaining to be done is to secure to the creditor satisfaction by an execution *in rem.*

The proviso makes it plain that original process alone is contemplated, for it provides that all statutes of limitation shall be suspended upon all claims against such persons.

II. Passing the question of the constitutionality of the law as it stands, and so far as the effect of it is to prevent the commencement of suits, the power of the legislature to pass any law which could bear the interpretation contended for here will be considered.

The Constitution of the United States, art. 1, § 10, provides that no state shall pass any *ex post facto* law, or law impairing the obligation of contracts.

. The Constitution of Pennsylvania, art. 9, § 17, that no *ex post facto* law, nor any law impairing contracts, shall be made.

These provisions have long since received a judicial construction, and it has been settled that an act which operates merely upon the remedy, and not upon the right, is not within the prohibition.

But it is equally well settled that any uncertain or indefinite postponement of the remedy, or any such interference with the remedy as injuriously affects the right, impairs the obligation of the contract, and cannot be sustained : Const. Penna., art. 9, § 11; Serg. on Const. Law 352. See also Brown *v.* Kinzie, 1 How. 316 ; McCracken *v.* Hayward, 2 Id. 608; Grantley's Lessee *v.* Ewing, 3 Id. 707.

The case of Chadwick *v.* Moore, 8 W. & S. 50, can hardly be reconciled with these principles. It has, to say the least, carried the doctrine of legislative power to the very extreme.

But the court are now asked to go far beyond it, and not only

to permit the legislature to impair the right to an "immaterial" or "inconsiderable" extent, but to prohibit its exercise indefinitely. The law fixes no period whatever for the duration of the stay.

That duration depends upon the will of the debtor. He may enlist for one, three, seven, or twenty years.

At the end of one enlistment he may return home, remain twenty-nine days, and then re-enlist for such term as he may please, thus rendering his creditor's security virtually a nullity.

It surely needs not the citation of an authority to show that such a law is contrary to the letter and spirit of both constitutions. Bunn & Raiguel v. Gorgas, 5 Wright 441, is, however, conclusive of the question.

The opinion of the court was delivered, February 26th 1863, by WOODWARD, J.—The 4th section of the Act of 18th April 1861, P. L. 409, is in these words: "No civil process shall issue or be enforced against any person mustered into the service of this state or of the United States, during the term for which he shall be engaged in such service, nor until thirty days after he shall have been discharged therefrom: *Provided*, that the operation of all statutes of limitation shall be suspended upon all claims against such person during such term."

The principal question upon the record is, whether this section be constitutional. Although it occurs in an act supplementary to the penal laws of the Commonwealth, and does not mention the *military* service, either of the state or of the United States, yet it is universally understood, and no doubt correctly understood, to be a stay law of all legal process against soldiers mustered into the military service of the government. And it is a stay for a term—the term for which he shall be engaged. The Act of Congress of 22d July 1861, under which the first half million of volunteers were mustered into the service of the United States, fixed the term at not more than three years, nor less than six months, and the affidavit which was filed on behalf of the defendant, says that he had been mustered in for three years, or during the war. This is the same phrase that was used in the 19th section of our Act of Assembly of 15th May 1861, in reference to the Reserve Volunteer corps, and means three years or less, or not exceeding three years. The term of engagement, therefore, during which the above section meant that the defendant should not be subject to civil process, was three years from the date of his muster, if the war should last so long, and if it should not, then until it should end. Thirty days were to be added after his discharge, which would make the utmost extent of the term three years and thirty days. The reference to the duration of the war is a restriction of the term, not an

[Breitenbach *v.* Bush.]

extension of it beyond three years and thirty days. The duration of the war was, at the date of the law, and still is, uncertain, but the maximum period of the stay—three years and thirty days from the date of the muster—is susceptible of ascer-tainment with absolute certainty. It was suggested that the volunteer might re-enlist at the expiration of his first term, and because this was possible, that the term of his engagement was necessarily uncertain. The answer is, that the statute gives but one stay, which is to be computed from the time of the original muster, and a re-enlistment would not renew the stay. The statute refers itself for the term of engagement to the laws that were then in force fixing the period of enlistment, and therefore we construe it according to the tenor of those laws.

Such being the significance and effect of the section, was the legislature authorized to enact it?

We have often said that stay laws, exemption laws, and limitation laws are ordinarily constitutional, though applied to existing and prior contracts, and we have followed the distinction which prevails in the Supreme Court of the United States, between the obligation of the contract and the remedies furnished by law for enforcing the obligation. We understand the rule to be that whilst the legislature may not impair the obligation they may modify the remedy. But it sometimes happens that the parties contract concerning the remedy—that they stipulate in the body of the contract, that in case of failure of payment by a certain day, there shall be no stay of execution, or that the mortgagee may enter and sell the mortgaged estate—or that all exemption rights shall be waived. In such cases the rule is that the remedy becomes part of the obligation of the contract, and any subsequent statute which affects the remedy impairs the obligation, and is unconstitutional. Brown *v.* Kenzie, 1 How. 322, and Billmyer *v.* Evans, 4 Wright 327, are illustrations of this rule. The time and manner in which stay laws shall operate are properly legislative questions, and will generally depend, said Judge Baldwin, in Jackson *v.* Lamphire, 3 Pet. Rep. 290, "on the sound discretion of the legislature, according to the nature of the titles, the situation of the country, and the emergency which leads to the enactment. Cases may occur where the provisions of a law may be so unreasonable as to amount to a denial of right, and call for the interposition of the court." In Bunn, Raiguel & Co. *v.* Gorgas, 5 Wright 441, we had an instance of an unreasonable stay law—unreasonable, because of the indefiniteness of the possible stay, and of the subversion of the authority of the courts over judgments upon their records. From the ruling in that case, and the authorities cited, it may be inferred that in respect to contracts which do not treat of remedies, we hold any law to be constitutional which gives a stay

[Breitenbach v. Bush.]

for a time. that is definite and not unreasonable, but unconstitutional if the stay be for an indefinite time, or for a time that is unreasonable, though definite.

We have seen that the stay given by the Act of 1861 was not indefinite as to its maximum duration, but was for a period certain and prefixed, or, at the least, a period that is capable of being easily reduced to certainty. Was that period reasonable? The stay is a long one, it must be confessed—longer than is usual—longer than can be justified, except by most peculiar and pressing circumstances. There is great force in the reasons which the learned judge below urged against it. The enforced delay of a civil right, the deterioration of the mortgaged estate, and the consequent pecuniary loss, are entitled to great consideration in judging of the reasonableness of the law. Everybody feels that a stay of remedies on a mortgage for fifty years, for instance, would be a wanton sacrifice of the constitutional rights of the citizen. What better is a stay for a less time if it be long enough to work essential depreciation of the security?

Yet it is impossible to separate this question of reasonableness from the actual circumstances in which the country found itself at the date of the law. Eleven states had seceded or revolted from the Federal Union, and had set up an independent government within the jurisdiction of the Constitution of the United States, and armed possession had been taken of forts, arsenals, custom-houses, navy-yards, and other property of the United States, within the boundaries of the revolted states. In the judgment of the President and Congress, who were the duly constituted authorities, the occasion required an immense increase of the army and navy, and the active employment of both of these strong arms to subdue the rebellion and restore the Union. Accordingly Congress authorized the President to accept volunteers, and to call upon the states for their militia. He did both, and a vast army has been in the field for many months.

Now, if a stay of execution for three years would not be tolerated in ordinary times, did not these circumstances constitute an emergency that justified the pushing of legislation to the extremest limit of the constitution? No citizen could be blamed for volunteering. He was invoked to do so by appeals as strong as his love of country. In the nature of things there is nothing unreasonable in exempting a soldier's property from execution whilst he is absent from home battling for the supremacy of the constitution and the integrity of the Union. And when he has not run before he was sent, but has yielded himself up to the call of his country, his self-sacrificing patriotism pleads, trumpet-tongued, for all the indulgence from his creditors which the legislature have power to grant. If the term of indulgence seem long in this instance, it was not longer than the time for which

the President and Congress demanded the soldiers' services.  It was not for him, nor is it for us to rejudge the discretion of the President and Congress in this regard.  Basing ourselves on what they did, constitutionally, the question for us is whether the stay granted by our own legislature to our citizen soldiers was unreasonable.  In view of the extraordinary circumstances of the case, we cannot pronounce it unreasonable.  We see in it no wanton or careless disregard of the obligation of contracts, but only a sincere effort to enable the general government to prosecute with success a war which, in its exclusive right of judgment, it resolved to wage.

Another circumstance which bears on the reasonableness of the enactment is the provision which suspends all statutes of limitation in favour of the soldier during all the time that he is exempted from process.  The provisions were reciprocal, and both were reasonable.

An argument against the applicability rather than the constitutionality of the fourth section, was drawn from the nature of the contract in suit, and of the process which the plaintiff was employing.  The proceeding was on a mortgage, and the writ sought to be stayed was a *levari facias.*  Counsel say that the word "process" in the fourth section means only that original process by which debtors are sued.  We do not think so.  "*No* civil process shall issue or be enforced," are words comprehensive enough to include all forms of execution as well as original and mesne process.  The word "enforced" implies execution process, and would scarcely apply to any other.  Nor is there anything in the nature of a mortgage to exempt it from the stay law.  A mortgage is indeed a contract, and so within the constitutional provisions which forbid the state to impair contracts, but its constitutional inviolability is no higher than that of a bond or promissory note.  The legislature cannot impair the obligation of *any* contract, but a suspension of remedies for a definite and reasonable time does not transcend the legislative faculty, because it impairs not the obligation of the contract.  If the parties adjust or modify the legal remedies for themselves by making them an express and substantive part of their contract, they cannot, as to that particular contract, be changed by the legislature ; but where the parties, whether to a mortgage or other contract, have not treated about the remedies, the constitutional power of the legislature is subject only to the limitations above suggested.  The notion that the process peculiar to a mortgage becomes necessarily an express part of the contract is more fanciful than sound.  The *scire facias* and *levari facias* are no more bargained about in a mortgage than the *summons* and the *fieri facias* are in a promissory note.  The law-making power

[Breitenbach *v.* Bush.]

prescribes all these writs, and fixes their times and modes of operation, and therefore may modify them within constitutional limits. All contracts that do not stipulate differently are supposed to be made in subordination to this power, and hence they are not impaired when the power is exerted.

The confession of judgment which the defendant signed on 21st of May 1860, contained these words: "Execution to stay until the 1st day of April next." It is argued on the authority of Billmeyer *v.* Evans, 4 Wright 324, that this was a stipulation about a stay which the Act of 1861 could not alter. The words in that case were "without stay of execution after the day of payment," and we held that the legislature could not add a stay in violation of the agreement. The difference in the two cases is apparent. Here the creditor granted a stay to a fixed date— the debtor stipulating nothing in respect to his liability after that date—there the debtor stipulated that there should be no stay after the day of payment. The legislature there contradicted the express stipulation—here it does not. Whilst the legislature never grants a second stay additional to a former legal stay, they may superadd a legal stay to a prior one voluntarily given by the creditor. That is all that was done here.

Having thus sustained the constitutionality of the 4th section of the Act of 1861, and having found it applicable to the case before us, it is obviously unnecessary for us to consider whether the Act of 2d of April 1822 is in force, or superseded by subsequent legislation, and whether, if in force, it is applicable to this case.

Before dismissing the cause, it is proper to observe that cases like this should come up by appeal, for as the affidavit of military service is no part of the record, it is not brought before us by a writ of error. It was proposed on the argument, and understood to be assented to by counsel, that this case should be treated as if here on appeal, and we have disposed of it accordingly.

And now, to wit, February 26th, this cause having been argued and fully considered, it is adjudged that the order of the court discharging the rule of June 16th 1862, be reversed and set aside, and the said rule is here made absolute.

READ, J., was absent at *Nisi Prius.*