Beaver County Building and Loan Association, Appellant, *v.* Winowich et ux.

Argued April 8, 1936; reargued May 25, 1936. Before KEPHART, C. J., SCHAFFER, MAXEY, LINN, STERN and BARNES, JJ.

*Charles McC. Barrickman,* with him *Thomas C. Buchanan,* of *Buchanan & Barrickman, Charles H. Kennedy* and *Ralph E. Smith,* for appellant.

*M. E. Rowley,* with him *W. D. Craig, H. E. Craig,* of *Craig & Rowley,* for appellees, defendants below.

*Edward Friedman,* Deputy Attorney General, with him *Charles J. Margiotti,* Attorney General, and *George*

*W. Keitel,* Assistant Deputy Attorney General, for Commonwealth, intervenor.

*Homer H. Swaney,* for amicus curiæ.

OPINION BY MR. JUSTICE STERN, October 5, 1936:

The question presented in this case is the constitutionality of the Act of January 17, 1934 (Spec. Sess.), P. L. 243, commonly known as the Mortgage Deficiency Judgment Act, as applied to mortgages contracted before its enactment.[1]

In every serious financial crisis in the history of our country there has been a legislative recognition of the need of relief for debtors. In the periods of industrial depression which have intermittently retarded our economic progress statutes were passed by various states to facilitate the liquidation of burdensome obligations, especially those arising from mortgages. Sometimes this legislation consisted of moratory laws, delaying proceedings for foreclosure or extending the period of redemption. Sometimes it aimed at the abolition or reduction of deficiency judgments, either by fixing a minimum price for the sale on execution or by providing that the "reasonable" or "fair" value of the property should be allowed as a credit on the debt irrespective of the amount realized. Sometimes courts of equity sought to give relief, in cases in which an adequate price had not been obtained, by refusing confirmation of the sale, or by granting it only on condition that a fair credit be given on the obligation secured by the mortgage.[2] In the re-

---

[1] In *Market Street National Bank v. Huff,* 319 Pa. 286, 288, it was said of this act: "We have not considered the constitutionality of the act before us, as that question was not raised."

[2] *Federal Title & Mortgage Guaranty Co. v. Lowenstein,* 166 Atl. 538, 113 N. J. Eq. 200; *Suring State Bank v. Giese,* 246 N. W. 556, 210 Wis. 489; *Monaghan v. May,* 273 N. Y. Supp. 475 (disapproved in *Emigrant Industrial Savings Bank v. Van Bokkelen,* 199 N. E. 23, 269 N. Y. 110). Contra: *Kenly v. Huntingdon Building Association,* 170 Atl. 526; 166 Md. 182.

cent depression resort has been had to practically all of these measures, and acts similar to the one before us have been passed in several states.

On July 14, 1931, defendants borrowed from plaintiffs $12,300, and to secure its repayment executed their judgment bond conditioned for the payment of the loan on or before July 1, 1941, with interest, dues and premiums as therein stipulated. Accompanying the bond was a mortgage covering certain real estate in the Borough of Aliquippa, Beaver County. Because of a default plaintiff on December 27, 1933, caused judgment to be entered on the bond, the real debt being $14,099.93, and on the same day issued a writ of execution under which the mortgaged premises were sold to plaintiff at sheriff's sale on February 5, 1934, for $962.94. Plaintiff failing to ask the court to determine the fair value of the property and to fix the amount of the deficiency judgment, defendants on December 12, 1934, petitioned that the judgment be marked satisfied in accordance with the provisions of the Act of January 17, 1934 (Spec. Sess.) P. L. 243, and the prothonotary thereupon entered satisfaction. On July 22, 1935, plaintiff filed a petition on which the court granted a rule on defendants to show cause why the satisfaction should not be stricken from the record. On October 11, 1935, the court dismissed this petition, from which order plaintiff appeals.

The basis of plaintiff's petition was the alleged unconstitutionality of the Mortgage Deficiency Judgment Act. That act, which is entitled "An Act To protect the owners of mortgaged property during the present emergency by limiting the amount of deficiency judgments during a certain period," provides "That whenever any real property is sold on any execution on the foreclosure of any mortgage, or on a judgment entered on any obligations secured by mortgage, and the sum for which such property was sold is not sufficient to satisfy the debt, interest and costs, the plaintiff or use plaintiff shall, within six months after such sale, petition the court out of

which such writ of execution issued to fix the fair value of the property sold. . . . Such petition shall be heard by a judge of such court sitting without a jury, or may . . . be referred to a master for hearing and determination, subject to confirmation by the court: . . .

"At all such hearings any party in interest may introduce in evidence testimony of the fair value of the premises sold at the time of the sale. In the event that the fair value so determined is greater than the price for which the property was sold, the amount of such fair value shall be deducted from the amount of the judgment, interest and costs, and a deficiency judgment entered for the balance.

"If the plaintiff or use plaintiff shall fail to present such petition within six months after such sale, the prothonotary shall, upon application of the defendant or other party in interest, enter satisfaction of such judgment. Such satisfaction shall have the effect of terminating as well the liability of all persons bound by any obligation securing the payment of such mortgage debt."

The act makes provision for notice of the presentation of the petition, and also provides for a jury trial to determine the fair value if either party so desires. By its terms it was to become effective immediately upon its enactment, and remain in force until July 1, 1935.

Plaintiff contends that the act is unconstitutional on the grounds (1) that, as applied to mortgages previously executed, it violates Article I, section 10, of the Constitution of the United States, which provides that "No State shall . . . pass any . . . law impairing the Obligation of Contracts, . . ." and Article I, section 17, of the Constitution of Pennsylvania, that "No . . . law impairing the obligation of contracts, . . . shall be passed"; (2) that it violates the fourteenth amendment to the Constitution of the United States, forbidding any state to deprive a person of property without due process of law; (3) that it violates Article III, section 7, of the Constitution of Pennsylvania, which pro-

vides that "The General Assembly shall not pass any local or special law: Authorizing the . . . impairing of liens; . . . or providing or changing methods for the collection of debts, or the enforcing of judgments, or prescribing the effect of judicial sales of real estate"; (4) that it violates Article III, section 3, of the Constitution of Pennsylvania, requiring the subject of an act to be clearly expressed in its title. In view of our opinion as to the first of the reasons thus assigned, it will not be necessary, for purposes of the present case, to consider any of the others.

In determining what constitutes the obligation of a contract, no principle is more firmly established than that the laws which were in force at the time and place of the making of the contract enter into its obligation with the same effect as if expressly incorporated in its terms: *McCracken v. Hayward,* 2 How. 608, 613; *Von Hoffman v. City of Quincy,* 4 Wall. 535, 550; *Walker v. Whitehead,* 16 Wall. 314, 317; *Edward v. Kearzey,* 96 U. S. 595, 607; *Barnitz v. Beverly,* 163 U. S. 118, 127; *Hooker v. Burr,* 194 U. S. 415, 420; *W. B. Worthen Co. v. Kavanaugh,* 295 U. S. 56, 60.

What, then, were the rights of a mortgagee under the law of Pennsylvania prior to the passage of the Mortgage Deficiency Judgment Act?

The theory in our state has always been that a mortgage is merely collateral for the payment of some primary obligation, usually a bond: *Tubb's Appeal,* 161 Pa. 252, 254; *White's Estate,* 322 Pa. 85, 89. As between the parties, both at law and in equity, it is a conveyance only so far as necessary to render the instrument effective as a security: *Presbyterian Corporation v. Wallace,* 3 Rawle 109, 130; *Wilson v. Shoenberger's Executors,* 31 Pa. 295; *Harper v. Consolidated Rubber Co.,* 284 Pa. 444, 451; *Bulger v. Wilderman & Pleet,* 101 Pa. Superior Ct. 168, 171; *Artisti-Kote Co. v. Benefactor Building & Loan Association,* 64 Fed. Rep. (2nd) 407, 408. The obligee could proceed either in personam or in rem.

If in personam he could resort to all the property of the debtor not protected by exemption laws, and for this purpose could issue one execution after another until the full amount of the debt was realized. If the obligee chose to proceed by foreclosure of the mortgage, the sum realized at the sale on execution was credited against the indebtedness, and the mortgagee could then pursue his debtor on the bond for the balance. It was immaterial to the mortgagee's rights whether he himself or some third person became the purchaser of the mortgaged property at the sheriff's sale: *White's Estate,* 322 Pa. 85, 89. As such purchaser the mortgagee obtained a new status in no way dependent upon his previous relationship to the mortgagor, and of the same legal attributes as that of any other purchaser of real estate at a judicial sale. As between the parties themselves, however hard the consequences might sometimes be, the amount realized at the sale was conclusive as to the value of the property: *Wolfe's Appeal,* 110 Pa. 126, 130; *Lomison v. Faust,* 145 Pa. 8; *Reutschlin's Estate,* 245 Pa. 473, 478; *White's Estate,* 322 Pa. 85, 89; *Mollenauer v. Smith,* 51 Pa. Superior Ct. 517, 523; *Bugh's Estate,* 95 Pa. Superior Ct. 29; *Artisti-Kote Co. v. Benefactor Building & Loan Association,* 64 Fed. Rep. (2nd) 407.[3] Therefore the deficiency judgment to which

[3] The rule is not necessarily applicable as between the mortgagee and other creditors of the mortgagor, or as between the mortgagee and third persons generally. See *Bugh's Estate,* 95 Pa. Superior Ct. 29, 34; *Weightman v. Union Trust Co.,* 208 Pa. 449. The rule in bankruptcy, unlike the general equity rule, is that proof of a claim is limited to the difference between the amount of the debt and the value of the security held or sold by the creditor: *In re Davis,* 174 Fed. Rep. 556; *In re Dix,* 176 Fed. Rep. 582; *In re McAusland,* 235 Fed. Rep. 173, 189; *In re Soltmann,* 238 Fed. Rep. 241, 244; *In re Thompson,* 276 Fed. Rep. 313; *In re Morgan,* 39 Fed. Rep. (2nd) 489, 491; Bankruptcy Act of 1898, sec. 57h. The federal bankruptcy rule was adopted in Pennsylvania, in *United Security Trust Co. Case,* 321 Pa. 276, in insolvency proceedings under the administration of the secretary of banking. It is to be

a mortgagee was entitled was the amount of the judgment, interest and costs, less the net proceeds received by him from the sale of the mortgaged property on foreclosure. The extent to which the debtor was released from personal liability was measured by the sale price, irrespective of the "fair" value, the "market" value, the "reasonable" value, or the "actual" value, of the property.

From this summary of the Pennsylvania law which governed the bond and mortgage in the present case when those instruments were executed, it is obvious that defendants' obligation was changed materially by the Mortgage Deficiency Judgment Act. Instead of their covenant in the bond to pay "the sum of twelve thousand three hundred dollars, *lawful money of the United States of America*" on or before July 1, 1941, plaintiff now was obliged to accept part payment of the debt in cash and part in real estate at a valuation appraised by a judge or jury, or, if such appraisement should fix the "fair value" of the property at an amount equal to or greater than the indebtedness on the bond, plaintiff must be content with receiving *only* real estate and no "lawful money" whatever.[4] Of course, there is no assurance of a mortgagee being able to realize from the property the amount of a valuation placed upon it in accordance

noted, however, that in bankruptcy, and in insolvency proceedings generally, the problem is not one between debtor and creditor, but among creditors inter se. See *Merrill v. National Bank of Jacksonville*, 173 U. S. 131.

[4] In *Palairet's Appeal*, 67 Pa. 479, Chief Justice SHARSWOOD said, p. 493: "No one has ever supposed that an Act of Assembly could authorize, in the case of a lawful existing contract, one of the parties to tender a collateral thing in satisfaction or extinguishment of it, whatever the value of that thing might be as compared with the damage sustained by the breach. Yet, in effect, that is just what is done by this act. The covenant is to pay an annual rent forever; a jury are authorized to say what principal sum shall be a satisfaction and extinguishment of that covenant; a collateral thing not provided for in the contract, and which might as well be anything else than money."

with the provisions of the act. The sale price is no longer conclusive between the parties as to the credit to be allowed on the debt, and the amount of the deficiency judgment to which the mortgagee was previously entitled is thus altered to a substantial and, it may be, drastic degree.

Few clauses of the federal constitution have been the subject of more interpretation by the Supreme Court of the United States than that which forbids a state from impairing the obligation of contracts. At first there was confusion arising from a somewhat shadowy distinction between the contract itself and the remedies to enforce it,[5] but the decisions have gradually clarified this difficulty, so that the governing principles are now reasonably well defined. Stating them in broad outline, to the extent to which they are here pertinent, they may be summarized as follows:

1. Any law which enlarges, abridges, or in any manner changes the intention of the parties as evidenced by their contract, imposing conditions not expressed therein or dispensing with the performance of those which are a part of it, impairs its obligation, whether the law affects the validity, construction, duration, or enforcement of the contract: *Story's Commentaries on the Constitution,* Book 3, ch. 34, sec. 1379.

"In the case at bar, the defendant has given his promissory note to pay the plaintiff a sum of money on or before a certain day. The contract binds him to pay that sum on that day; and this is its obligation. Any law which releases a part of this obligation, must, in the literal sense of the word, impair it." Chief Justice MARSHALL in *Sturges v. Crowninshield,* 4 Wheat. 122, 197.

2. A mortgage is a contract within the protection of the constitutional provisions against impairment: *Breitenbach v. Bush,* 44 Pa. 313, 320; *Philadelphia Trust Co. v. Northumberland County Traction Co.,* 258 Pa. 152,

---

[5] See *W. B. Worthen Co. v. Kavanaugh,* 295 U. S. 56, 60.

165, 167; *W. B. Worthen Co. v. Kavanaugh,* 295 U. S. 56.

3. A judgment for the amount due under a contract remains an obligation of the contract, and it may not be affected by legislation which would impair the antecedent obligation of the contract upon which it is founded. If, therefore, the subsequent law, instead of directly abrogating the contract, unreasonably restricts or oppressively burdens the enforcement of a judgment rendered thereon, it is none the less obnoxious to the constitutional prohibition: *W. B. Worthen Co. v. Thomas,* 292 U. S. 426, 432.

4. The *amount* of impairment of the substantive obligation of a contract is immaterial. Any deviation from its terms, however slight, falls within the meaning of the constitution: *Greene v. Biddle,* 8 Wheat. 1, 84; *Ogden v. Saunders,* 12 Wheat. 213, 256; *Walker v. Whitehead,* 16 Wall. 314, 318.

"One of the tests that a contract has been impaired is that its value has by legislation been diminished. It is not, by the constitution, to be impaired *at all.* This is not a question of degree or manner or cause, but of encroaching in any respect on its obligations, dispensing with any part of its force." *Planters' Bank of Mississippi v. Sharp,* 6 How. 301, 327. (Italics supplied.)

5. The remedy, or means of enforcing a contract, is a part of its obligation which the constitution protects. The legislature has the power to formulate, alter and suspend modes of procedure, even as to pre-existing contracts, provided that, under the guise of a procedural statute, it does not deprive a party of any substantial right under the contract: *Breitenbach v. Bush,* 44 Pa. 313, 318, 320; *Penrose v. Erie Canal Co.,* 56 Pa. 46, 48; *West Arch Building & Loan Association v. Nichols,* 303 Pa. 434. Any change in procedure which does not supply an alternative remedy, equally adequate and efficacious, in place of that which existed when the contract was made, is violative of the constitutional prohibition.

The ideas of right and remedy are inseparable: *Greene v. Biddle,* 8 Wheat. 1, 17; *Walker v. Whitehead,* 16 Wall. 314, 317; *Edwards v. Kearzey,* 96 U. S. 595, 600; *Mc-Gahey v. Virginia,* 135 U. S. 662, 693; *Barnitz v. Beverly,* 163 U. S. 118, 127; *Oshkosh Waterworks Co. v. Oshkosh,* 187 U. S. 437, 439.[6]

When we read the decisions in order to study their application of these principles and to determine the question of the validity of the present act as measured by their mandates, we must always bear in mind the distinction between legislation which merely postpones the legal vindication of rights and that which curtails or injuriously affects the rights themselves or the efficacy of the remedies provided for their enforcement. Generally speaking, the trend of authority is one of judicial support of a statute the purpose of which is merely to delay redress or shorten periods of limitation in which legal action must be taken,—always provided that the stays granted and limitations imposed are reasonable and definite in duration and that the act safeguards the rights of the party affected during the period in which he is compelled to forego the pursuit of his remedies. A recent authority establishing the constitutionality of this type of legislation is *Home Building & Loan Association v. Blaisdell,* 290 U. S. 398, involving a moratorium law of Minnesota. There the Supreme Court of the United States sustained the validity of an act which provided for postponement of execution sales in foreclosure proceedings, for an extension of the period of redemption during the continuance of the emergency but

---

[6] If the parties expressly make a certain remedy an integral part of their contract, they place it beyond the power of the legislature to alter it so far as their rights thereto are affected, as, for example, in the case of a debtor's waiver of exemption or stay of execution: *Billmeyer v. Evans & Rodenbaugh,* 40 Pa. 324, 327; *Breitenbach v. Bush,* 44 Pa. 313, 318; *Lewis v. Lewis,* 47 Pa. 127; *White v. Crawford,* 84 Pa. 433, 437; *Weist v. Wuller,* 210 Pa. 143, 145; *Galey v. Guffey,* 248 Pa. 523, 528; *Philadelphia Trust Co. v. Northumberland County Traction Co.,* 258 Pa. 152, 165.

in no event beyond May 1, 1935, and for a suspension of actions for deficiency judgments until the extended period of redemption had expired. Relief could be granted only on application to the court, and provision was made for the continuing payment by the mortgagor of the income or rental value on account of the carrying charges. Chief Justice HUGHES said, p. 439: "It cannot be maintained that the constitutional prohibition should be so construed as to prevent limited and temporary interpositions with respect to the enforcement of contracts if made necessary by a great public calamity . . ." The Chief Justice (p. 445) emphasized the fact that: "As already noted, the integrity of the mortgage indebtedness is not impaired; interest continues to run; the validity of the sale and *the right of a mortgagee-purchaser* to title or *to obtain a deficiency judgment,* if the mortgagor fails to redeem within the extended period, *are maintained;* and the conditions of redemption, if redemption there be, stand as they were under the prior law." (Italics supplied.)

The still later case of *W. B. Worthen Co. v. Kavanaugh*, 295 U. S. 56, is illustrative of the fact that even moratory legislation will not be judicially sanctioned unless buttressed by adequate protection of the mortgagee during the period of enforced inaction. In that case Mr. Justice CARDOZO said, pp. 61, 62, in reference to an act of Arkansas: "A minimum of six and a half years is thus the total period during which the holder of the mortgage is without an effective remedy. There is no enforcible obligation in the interval to pay installments of the principal or even the accruing coupons. The case is not one in which the Chancellor has intervened, either with or without the permission of a statute, to halt the oppressive enforcement of a mortgage by putting off the day of sale or entry for a reasonable time upon compliance by the debtor with reasonable conditions. . . . There is not even a requirement that the debtor shall satisfy the court of his inability to pay. . . . A state

is free to regulate the procedure in its courts even with reference to contracts already made *(Bronson v. Kinzie,* 1 How. 311), and moderate extensions of the time for pleading or for trial will ordinarily fall within the power so reserved. A different situation is presented when extensions are so piled up as to make the remedy a shadow. . . . So viewed they [the changes of remedy prescribed by the act] are seen to be an oppressive and unnecessary destruction of nearly all the incidents that give attractiveness and value to collateral security."

Stay laws have been passed at various times in Pennsylvania,[7] and, where reasonable in their terms, have been upheld by this court. In *Chadwick v. Moore,* 8 W. & S. 49, the act involved was that of July 16, 1842, P. L. 407, which provided that lands taken in execution should be appraised by an inquest, and if they could not be sold at public sale for at least two-thirds of such valuation the sheriff should not make the sale, and all proceedings should thereupon be stayed for a year from the return

---

[7] The Act of June 16, 1836, P. L. 755, sec. 3, stayed executions against freeholders in certain cases for a period ranging from six to twelve months. The Act of July 16, 1842, P. L. 407, stayed judicial sales of real property for one year when less than two-thirds of the appraised value was bid. The Act of October 13, 1857, P. L. of 1858, 611, stayed executions against freeholders for a maximum period of one year. So did the Act of May 21, 1861, P. L. 770; it also stayed execution against a debtor if the creditors holding at least two-thirds of the claims against him so agreed. The Acts of April 18, 1861, P. L. 408, April 11, 1862, P. L. 484, April 28, 1899, P. L. 133, sec. 59, and April 9, 1915, P. L. 80, sec. 60, granted moratory relief to persons in military service. The Act of March 23, 1877, P. L. 29, granted a stay of execution sales of real estate, if the land could not be sold for a minimum of two-thirds of its appraised value. The Act of May 18, 1933, P. L. 826, which expired March 31, 1935, but was re-enacted by the Act of March 27, 1935, P. L. 7, and continued in force until March 31, 1937, conferred on the court the power to stay any writ of execution against dwellings for such period and on such terms as it might deem proper, if the conditions in the case seemed to warrant such relief because of the economic emergency working serious inequity.

day of the writ. The act was sustained on the ground that the temporary restraint of the remedy did not unreasonably impair the mortgagee's rights. So, in *Breitenbach v. Bush*, 44 Pa. 313, and in *Coxe's Executor v. Martin*, 44 Pa. 322, the Act of April 18, 1861, P. L. 408, staying civil process against persons mustered into the military service for the term of their enlistment, was upheld as constitutional.[8]

Throughout the states generally, moratory legislation has been sustained or invalidated according to the reasonableness of the statute in regard to the period of extension granted by it and the interim protection of the creditor.[9]

Turning from cases dealing with a temporary suspension of remedies to decisions concerned with impairment of the creditor's substantive or remedial rights, those in the Supreme Court of the United States are, of course, conclusive as to the construction of the federal constitution. *Bronson v. Kinzie*, 1 How. 311, and *McCracken v.*

---

[8] Where, however, the term of service was indefinite, as "for the term of the war," the stay under the act, being uncertain and unascertained, was stricken down: *Clark v. Martin*, 49 Pa. 299. The same fate met the Act of May 21, 1861, P. L. 770, which provided for a stay, which might be unlimited, upon agreement to that effect of creditors whose claims exceeded two-thirds of the indebtedness: *Bunn, Raiguel & Co. v. Gorgas*, 41 Pa. 441.

[9] Constitutional: *Reiman v. Rawle*, 68 S. W. (2nd) 470, 188 Ark. 983; *Des Moines Joint Stock Land Bank of Des Moines v. Nordholm*, 253 N. W. 701, 217 Iowa 1319 (extending period of redemption); *Metropolitan Life Ins. Co. v. Morris*, 159 So. 388, 181 La. 277; *Russell v. Battle Creek Lumber Co.*, 252 N. W. 561, 265 Mich. 649; *Wilson Banking Co. Liquidating Corp. v. Colvard*, 161 So. 123, 172 Miss. 804; *Klinke v. Samuels*, 190 N. E. 324, 264 N. Y. 144;

Unconstitutional: *Alliance Trust Co., Ltd., v. Hall*, 5 Fed. Supp. 285 (D. Ct. D. Idaho); *State ex rel. Cleverings v. Klein*, 249 N. W. 118, 63 N. Dak. 514 (extending period of redemption); *State ex rel. Roth v. Waterfield*, 29 Pac. (2nd) 24, 167 Okla. 209; *Travelers' Ins. Co. v. Marshall*, 76 S. W. (2nd) 1007, 124 Tex. 45; *Hanauer v. Republic Building Co.*, 255 N. W. 136, 216 Wis. 49.

*Hayward,* 2 How. 608, dealt with statutes of Illinois which provided for an extension of the period of redemption, and further that, when execution was levied on any property, an inquest should be held as to valuation, and the sale should not be consummated unless at least two-thirds of the appraisement was bid for the property. These statutes were held unconstitutional when applied to existing mortgages or judgments. In the *McCracken* case the court said, p. 613: "If the defendant had made such an agreement as to authorize a sale of his property, which should be levied on by the sheriff, for such price as should be bid for it at a fair public sale on reasonable notice, it would have conferred a right on the plaintiff, which the constitution made inviolable; and it can make no difference whether such right is conferred by the terms or law of the contract. Any subsequent law which denies, obstructs, or impairs this right, by superadding a condition that there shall be no sale for any sum less than the value of the property levied on, *to be ascertained by appraisement, or any other mode of valuation than a public sale,* affects the obligation of the contract, as much in the one case as the other, for it can be enforced only by a sale of the defendant's property, and the prevention of such sale is the denial of a right." (Italics supplied.)[10]

In *Gantly's Lessee v. Ewing,* 3 How. 707, 716, an act of Indiana provided that no real estate should be sold on

---

[10] In *Chadwick v. Moore,* 8 W. & S. 49, 50, Chief Justice GIBSON distinguished the Pennsylvania Act of 1842 from the Illinois statute involved in *McCracken v. Hayward* by stating that in the former the stay of execution was for a year if the land did not bring the stipulated minimum, and the creditor could then proceed as if the execution had not been suspended, but "The statute of Illinois had no such limitation. Its denial of execution was perpetual, except on terms not originally contemplated; and it not merely impeded the remedy, but changed the conditions of the right. The statute of Pennsylvania suspends the remedy only; . . ."

execution for less than half its appraised value. It was declared to be unconstitutional as applied to pre-existing mortgages.

*Howard v. Bugbee,* 24 How. 461, was a case in which an Alabama statute authorized a redemption of mortgaged property in two years after the foreclosure sale. It was held invalid as to sales made under mortgages executed prior to the date of its enactment.

In *Gunn v. Barry,* 15 Wall. 610, a creditor obtained a judgment lien on his debtor's property at a time when the law of Georgia allowed to debtors only a small exemption of land owned by them. The state adopted a new constitution which provided for a larger exemption. It was declared, as to this creditor, to be an impairment of his contractual rights.[11]

*Barnitz v. Beverly,* 163 U. S. 118, involved a law of Kansas which extended the period of redemption after a mortgage foreclosure sale to eighteen months, during which time the mortgagor was to remain in possession and receive rents and profits, except as necessary for repairs. The redemption money was to consist, not of the amount of the mortgage debt, interest and costs, but of the sum paid by the purchaser at the sale, with interest, costs and taxes. The court held the statute unconstitutional as applied to a sale under a mortgage executed before its passage, saying, p. 130: "Obviously this scheme of foreclosure renders it necessary for the mortgagee to himself bid, or procure others to bid, the entire amount of the mortgage debt, *and thus, in effect, release the debtor from his personal obligation. . . .* But it seems impossible to resist the conviction that such a change in the law is not merely the substitution of one remedy for another, but is a substantial impairment of the rights of the mortgagee as expressed in the contract." (Italics supplied.)

[11] To the same effect *Edwards v. Kearzey,* 96 U. S. 595. See also *W. B. Worthen Co. v. Thomas,* 292 U. S. 426; *Penrose v. Erie Canal Co.,* 56 Pa. 46.

In *Bradley v. Lightcap,* 195 U. S. 1, before the passage of the Illinois statute there under consideration, when a mortgagee at a foreclosure sale bid in the mortgaged property at less than the amount due, and the mortgagor did not redeem, failure by the mortgagee to take out a deed had no effect on the original title of the mortgagee as against the mortgagor. By the statute it was provided that if the mortgagee being in possession, bid in the mortgaged premises at foreclosure sale at less than the amount found due on the mortgage, and the mortgagor did not redeem, the legal title of the mortgagee and his right of possession should be forfeited to the mortgagor by failure to obtain a deed within a certain prescribed time, although the mortgagor had not in fact paid anything in extinguishment of the mortgage debt. It was held that the act was invalid as to a mortgage executed and possession taken by the mortgagee prior to its enactment.

The situation in *W. B. Worthen Co. v. Kavanaugh,* 295 U. S. 56, was that certain bonds had been issued by a municipal improvement district, secured by a mortgage of benefit assessments. After the execution of the mortgage Arkansas enacted a statute which changed the method of enforcing the payment of assessments; the time for foreclosure and sale of the land on default was substantially extended, the penalty for non-payment drastically reduced, the periods for the various stages of legal procedure lengthened, the time for redemption increased, and the interim occupancy of the delinquent owner protected. The act was held invalid. The court distinguished the Minnesota moratorium case, and said, p. 60: "A catalogue of the changes imposed upon this mortgage must lead to the conviction that the framers of the amendments have put restraint aside. With studied indifference to the interests of the mortgagee or to his appropriate protection they have taken from the mortgage the quality of an acceptable investment for a rational investor."

In *Louisville Joint Stock Land Bank v. Radford*, 295 U. S. 555, the Frazier-Lemke Amendment of June 28, 1934, c. 869, 48 Stat. 1289, adding sub-section (s) to section 75 of the Bankruptcy Act, was held to be unconstitutional. The amendment provided that a farmer who had failed to obtain the consents requisite to a composition might, upon being adjudged a bankrupt, acquire alternative options in respect to mortgaged property, either purchasing it on the installment plan, if the mortgagee assented, at its then appraised value, or, if the mortgagee refused such assent, obtaining a stay of all proceedings for a period of five years, meanwhile remaining in possession and paying a reasonable rental, and at the end of such period obtaining full title by paying the appraised price of the property. The amendment applied only to existing debts. The court declared that, while Congress, unlike the states, was not prohibited from impairing the obligation of contracts, the effect of the act was to take away valuable rights in property which had been acquired by the mortgagee. In the course of his opinion Mr. Justice BRANDEIS said, pp. 579, 580, 581: "No instance has been found, except under the Frazier-Lemke Act, of either a statute or decision compelling the mortgagee to relinquish the property to the mortgagor free of the lien unless the debt was paid in full. . . . His position in this respect was not changed when foreclosure by public sale superseded strict foreclosure. . . . In many states other statutory changes were made in the form and detail of foreclosure and redemption. But practically always the measures adopted for the mortgagor's relief, including moratorium legislation enacted by the several states during the present depression, resulted primarily in a stay; and the relief afforded rested, as theretofore, upon the assumption that no substantive right of the mortgagee was being impaired, since payment in full of the debt with interest would fully compensate him.

"Statutes for the relief of mortgagors, when applied to pre-existing mortgages, have given rise, from time to time, to serious constitutional questions. The statutes were sustained by this court when, as in *Home Building & Loan Association v. Blaisdell,* 290 U. S. 398, they were found to preserve substantially the right of the mortgagee to obtain, through application of the security, payment of the indebtedness. They were stricken down, as in *W. B. Worthen Co. v. Kavanaugh,* 295 U. S. 56, when it appeared that this substantive right was substantially abridged."[12]

While it is true that none of the cases thus summarized is wholly analogous to the present one, they lead fairly to the conviction that a statute which compels a mortgagee to accept real estate at an appraised valuation, in place of money, as a part liquidation of the mortgagor's obligation on the bond, must, as applied to pre-existing mortgages, be held to be unconstitutional if the obvious trend of these decisions in the Supreme Court of the United States is to be followed. This conclusion is strengthened by the almost complete unanimity of state courts in striking down recent legislation curtailing the rights of mortgagees,—some of it practically identical with the act now under consideration.

A statute in Arkansas provided that in foreclosure proceedings the mortgaged property should be consid-

---

[12] The Frazier-Lemke Act was amended on August 28, 1935, by reducing the time for stay of proceedings from five to three years, and authorizing the court to shorten the period of delay still more if the emergency ceased to exist in the particular locality. Nevertheless this second Frazier-Lemke Act also was declared unconstitutional in *U. S. National Bank of Omaha v. Pamp,* 83 Fed. (2nd) (C. C. A. 8) 493; *In re Lowmon,* 79 Fed. (2nd) (C. C. A. 7) 887; *In re Young,* 12 Fed. Supp. (D. C. S. D. Ill.) 30; *In re Sherman,* 12 Fed. Supp. (D. C. W. D. Va.) 297; *In re Lindsay,* 12 Fed. Supp. (D. C. N. D. Iowa) 625; *In re Tschoepe,* 13 Fed. Supp. (D. C. S. D. Texas) 371; *In re Schoenleber,* 13 Fed. Supp. (D. C. D. Nebr.) 375. Contra: *In re Bennett,* 13 Fed. Supp. (D. C. W. D. Mo.) 353.

ered to be of the value of the loan, irrespective of the amount which might be realized at the sale, thus in effect abolishing deficiency judgments. It also undertook to change the rule that a court will not refuse to confirm a judicial sale merely because of inadequacy of price. It was held to violate the obligations of pre-existing mortgage contracts: *Adams v. Spillyards,* 61 S. W. (2nd) 686, 187 Ark. 641.

A statute in California limited recovery to the difference between the amount of the debt and the fair market value of the real estate at the time of the sale. The act was declared to be unconstitutional: *Bennett v. Superior Court of Los Angeles County,* 42 Pac. (2nd) 80, 5 Cal. App. Rep. (2nd) 13. An act of the same state precluding the right to a deficiency judgment on a mortgage obligation unless notice of breach and an election to sell was recorded one year before the sale, was held invalid if retroactively applied: *Brown v. Ferdon,* 54 Pac. (2nd) 712, 5 Cal. (2nd) 226.

An act of New Jersey which provided for the deduction of the fair market value from the debt, was invalidated, as to pre-existing contracts, in *Vanderbilt v. Brunton Piano Co.,* 169 Atl. 177, 111 N. J. Law 596. The court said, p. 178 (pp. 598, 599) : "There can be no doubt that the amendment substitutes the 'fair market value' determined in the subsequent action on the bond in place of the proceeds of the sale in foreclosure as the credit to be allowed the debtor in reduction of the debt. It is apparent that when an obligee on a bond has, as an incident to his contract, the right to recover a liquidated sum, first by receiving the proceeds from the sale of the pledged property and supplementarily by a personal action, and a statute is thereafter passed, the direct effect of which is to provide an opportunity to the debtor for reducing the sum recoverable, his contract is impaired. It might well happen in a given case that under the questioned statute the entire right sued upon in the law action would dissolve. . . . There is no legal obligation

upon a mortgagee either to bid up, or to bid in, the property at the foreclosure sale, and the impairment of his contract is the more obvious when the property is struck off to a third person at a figure less than that subsequently fixed in the action on the bond as the 'fair market value.' In such a posture the mortgagee . . . is compelled to forfeit a part of the debt which his contract, valid and enforceable when made, gave him; at least his remedy for enforcing the contract has been taken away. . . . The statutory setting up of fair market value, standing stark and alone, as a self-sufficient, resistless fact in reduction of an otherwise collectible debt is such a restriction and limitation upon the mortgagee's right of recovery as to be an impairment of a pre-existing contract, . . ." A later act provided for similar relief to mortgagors, but limited its operation to July 1, 1938, and declared that a serious public emergency existed. Nevertheless it also was held to be invalid in *Sayre v. Duffy,* 179 Atl. 459, 13 N. J. Misc. 458.

A statute in Texas provided that where the mortgagor could show that the property was sold on foreclosure for less than its actual value there should be allowed on the deficiency judgment a credit of the difference between the actual value and the sale price. The court declared it unconstitutional: *Langever v. Miller,* 76 S. W. (2nd) 1025, 1029, 124 Tex. 80, 88, saying: "It seems to us that the act before us does in fact operate upon and impair the 'obligation' of the contract, in that it nullifies that portion of the contract, read in the light of the then existing statute, which entitled the mortgagee to a deficiency judgment. But, if the statute be regarded as one which merely operates upon the remedy or remedies for the enforcement of the contract, it is obvious that it abridges the rights of the mortgagee resulting from the stipulations in the agreement in such manner as to make the contract less valuable, and denies him lawful remedies which existed when the instrument was executed

without substituting therefor others equally valuable and equally effective."

Georgia enacted a law precluding the entry of a deficiency judgment unless the foreclosure sale was confirmed on a finding that the property brought its true market value. As to mortgages executed before its passage it was held invalid in *Atlantic Loan Co. v. Peterson*, 182 S. E. 15, 181 Ga. 266.

An act of Arizona took away the right to a deficiency judgment unless the mortgagee was able to prove that the value of the property when the mortgage was executed was not in excess of the amount remaining due on the debt after the foreclosure sale, or that the depreciation in value was caused by some act of the mortgagor; if he established such proof he could recover a deficiency judgment for the difference between the value of the property when the mortgage was given and the amount due on the debt. This act was declared unconstitutional in *Kresos v. White, Superintendent of Banks*, 54 Pac. (2nd) 800.

New York is apparently the only state which has sustained the validity of a mortgage deficiency judgment act similar to the Pennsylvania statute. The act temporarily stayed foreclosures and suits to recover the mortgage indebtedness if interest and taxes were paid. It also provided for a deficiency judgment to be fixed at the time of confirmation of the sale, allowing a credit for the market value of the property as determined by the court, or the sale price, whichever might be the higher. In actions to recover the indebtedness secured by the mortgage the debtor was to be allowed to set off the "fair and reasonable market value" of the property. In a brief opinion on the question of constitutionality, unsupported by any citation of authorities, the court upheld the act: *Klinke v. Samuels*, 190 N. E. 324, 264 N. Y. 144.[13]

---

[13] This decision was restricted in its application in subsequent cases: *Feiber Realty Corp. v. Abel*, 191 N. E. 847, 265 N. Y. 94;

The change wrought by the Pennsylvania Mortgage Deficiency Judgment Act is one not merely of remedy but of substance. Whereas before its enactment the mortgagee after a sale on foreclosure had the important right to a judgment measured by the difference between the debt and the net proceeds realized from the sale, by the terms of the act this judgment is reduced by substituting the "fair value" of the property for the price obtained at the sale as the amount of the credit to be allowed. Incidentally it may be noted that in the use of the term "fair value" there is introduced an indefinite and to some extent meaningless standard. The amount of the credit can be measured only in terms of money into which the property may presumably be converted, and to fix a realizable money value, as distinguished from a use or rental value, is practically impossible unless the phrase "fair value" be held to be synonymous with fair *market* value. It was so construed in *Market Street National Bank v. Huff,* 319 Pa. 286, where it was said, pp. 287, 288: "Any other [value] would not be fair, but speculative." But the act says that the "fair value" is to be determined as of "the time of the sale," and yet the very raison d'etre of the act was the fact that the depression had caused the disappearance of a market for real estate and therefore of market values, for where there is no market there can be no market value. That this statement of the inherent weakness of the act is not merely academic or hypercritical is shown by the experience of the courts in hearings to establish deficiency judgments, where real estate experts, instead of testify-

---

*Weisel v. Hagdahl Realty Co.,* 271 N. Y. Supp. 629; *Emigrant Industrial Savings Bank v. Van Bokkelen,* 269 N. Y. 110; *Provident Savings Bank & Trust Co. v. Steinmetz,* 270 N. Y. 129. It was also questioned to some extent in *New York Life Ins. Co. v. H. & J. Gattag Corp.,* 192 N. E. 481, 265 N. Y. 292. But it was applied, without further discussion of the question of constitutionality, in *City Bank Farmers Trust Co. v. Ardlea Corp.,* 196 N. E. 34, 267 N. Y. 224; and *Clarke v. Schumann,* 269 N. Y. 60.

ing to their opinions of value based on recent market sales of neighboring properties, are obliged, in the absence of such sales and of any actual market standard, to make a theoretical and arbitrary appraisement of the property as representing the "fair" value.

The facts in the present case do not call for a discussion of a further obviously untenable feature of the act, —that apparently the mortgagee must allow the "fair value" credit on his judgment even if he does not himself purchase the property at the foreclosure sale. In that event the mortgagee receives no consideration, either in money or real estate, for the enforced credit given by him to the mortgagor as representing a part payment which has no basis whatever in fact.

It has been argued that the Mortgage Deficiency Judgment Act provides merely for a new method of appraising the value of the mortgaged property; that formerly this was accomplished by a sheriff's sale, but, since that instrumentality has been rendered worthless for the purpose by reason of the emergency conditions, some other system had to be adopted; that therefore the change is merely an innocuous one of remedy. This argument, however, is not founded upon fact, because it was never true that the object of a sheriff's sale was to fix a valuation of the property; its only purpose was to execute a writ of sale in order that the mortgagee might, through the agency of a public official, convert the collateral security held by him into cash and thus realize whole or partial payment of the debt.

It is contended that it is unfair to allow a mortgagee, under existing conditions, to bid in the mortgaged property for a nominal sum, thereby unjustly enriching himself by acquiring the security and at the same time retaining the right to collect what might amount to almost the entire debt from other property of the mortgagor. It may be questioned whether mortgagees in many cases have been able to realize more from both acquisition of the property and collection on the bond than the amount

of the debt, interest and costs. Even if, however, as a bidder at the foreclosure sale, a mortgagee obtains the property at a cheap price, he accomplishes this, as already stated, in an independent capacity and not as mortgagee; as a purchaser he obtains the same title as might have been acquired by any member of the general public in competitive bidding.[14]  Moreover, if the system of foreclosures in use does bring about undesirable results, it may be corrected by the parties originally contracting to adopt the appraisement method (assuming that an investor could be induced to loan money on the security of a mortgage with such a provision), or, as to future mortgages, by appropriate legislation. But as to existing mortgages the constitutions of nation and state alike prohibit any such impairment of the mortgagee's rights.

Defendants argue that plaintiff cannot question the constitutionality of the provision of the act that the fair value is to be allowed as a credit, because plaintiff's judgment was not actually subjected to such reduction; plaintiff having allowed a period exceeding six months to elapse without petitioning the court to fix the fair value, the judgment was marked satisfied in accordance with another provision of the act. It is claimed, therefore, that it is only of the latter that plaintiff can complain, but that such provision is merely equivalent to a statute of limitations and as such is constitutional. This contention is specious, for it overlooks the fact that plaintiff could not prevent the time limitation from obliterating its judgment except by submitting to the unconstitutional alternative of petitioning for the fixing of

---

[14] In *Connecticut Mutual Life Ins. Co. v. Cushman,* 108 U. S. 51, 64, and *Hocker v. Burr,* 194 U. S. 415, the distinction is pointed out between mortgagee and purchaser at the foreclosure sale in regard to the impairment of contractual obligation. It is the mortgagee's rights as such, not as purchaser, that are determined by the mortgage contract and the law governing it at the time of its execution.

a reduced deficiency indebtedness. The penalty for refusing to accept a partial loss of a contractual right was thus the deprivation of the right altogether.

It is urged that the act gains validity by reason of its being limited in duration. But while the temporary suspension of a right may be justified under certain conditions, the Mortgage Deficiency Judgment Act during its period of operation acts permanently and finally upon the rights of the mortgagees affected by it. A statute which, though in operation only for a brief period, compels a creditor during that time to accept less than the amount due, or in a different kind of payment, is, as to him, as definitive in its effect as if it were permanently in force. So, under the present act, a mortgagee whose judgment is marked satisfied, or improperly reduced in amount, has no possibility of relief thereafter, and profits nothing by the shortness of time to which the act is limited. His contractual rights are irrevocably impaired. The real test is not the duration of the act, but whether the result which it brings about in a given case is permanent or temporary.

Nor is there greater merit in the argument that the act is nothing more than a moratory law, because a mortgagee was not obliged to foreclose while it was in force and thereby to subject himself to its illegal provisions. Even if it were to be admitted that a stay of foreclosure sales for eighteen months (the period of duration of the act) without any qualifications or conditions imposed upon mortgagor or terre-tenant, would not be invalid, the act does not in terms provide for such a stay nor purport to delay action in any manner. There is no indication of an intention of the legislature to compel mortgagees to postpone or abstain from foreclosures or evictions. The act seeks only to control the amounts of deficiency judgments in personam. It would be unprecedented legal doctrine to hold that, although its provisions are unenforceable, the only recourse of a creditor is to wait until the objectionable act expires. Being un-

constitutional in its requirement of the crediting of the "fair value" on the judgment, it cannot gain the attribute of validity by providing for its own limitation. There is an obvious difference between an act the purpose and express provision of which is the prescription of a reasonable and safeguarded stay, and one which attempts to accomplish an illegal deprivation of the substantive rights of a creditor, even if its invalid operation is only for a temporary period. To sanction a contrary view would be to permit the legislature to enact legislation by the device of a continuity of statutes which, if fused into one, would admittedly be prohibited by the constitution. In this very case a statute was enacted on July 1, 1935, P. L. 503, the date of expiration of the original act, which in substance renews the provisions of the Act of January 17, 1934, placing still greater restrictions upon recovery of the mortgage indebtedness, and effective until June 30, 1937; it provides in section 11 that "This act shall be deemed and shall be construed to be a continuation of the provisions of the act, approved the seventeenth day of January, 1934, . . . and all rights vested, or duties or obligations imposed, or rights forfeited under the provisions of said act, shall be deemed continued, so vested, imposed or forfeited under this act and enforceable under this act, notwithstanding the expiration of said act of January seventeenth, 1934, by its own limitation."

A plea of justification as emergency legislation is invoked in defense of the statute. It is urged that the exigencies of the times require a certain degree of obliviousness to the mandates of the constitution and to the decisions which have construed them. Under our constitutional system, however, emergency cannot create a power nor diminish restrictions: *Ex Parte Milligan*, 4 Wall. 2, 120, 121; *Wilson v. New*, 243 U. S. 332, 348; *Home Building & Loan Association v. Blaisdell*, 290 U. S. 398, 425, 426; *A. L. A. Schechter Poultry Corp. v. United States*, 295 U. S. 495, 528, 529. A necessity that

is higher than the constitution can have no place in American jurisprudence; it can be met only by constitutional amendment. "No doctrine," said the court in *Ex Parte Milligan*, 4 Wall. 2, 121, "involving more pernicious consequences, was ever invented by the wit of man than that any of its [the constitution's] provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism . . ."

Finally, it is claimed that this act is an exercise of the police power and as such overrides all barriers that otherwise might be sufficient to invalidate it. It is true, generally speaking, that the obligations of contracts cannot be allowed to impede the exercise of the police power, which is always paramount: *Manigault v. Springs*, 199 U. S. 473, 480; *Marcus Brown Co. v. Feldman*, 256 U. S. 170, 198; *Home Building & Loan Association v. Blaisdell*, 290 U. S. 398, 434, 435; *Commonwealth v. Widovich*, 295 Pa. 311, 318; 6 R. C. L. 199, § 195. It is also true that the original conception of the police power, which confined it to the protection of public health, safety and morals, has broadened so as to include many phases of the general welfare which, in earlier periods of constitutional history, would not have been deemed to be within its scope: *Manigault v. Springs*, 199 U. S. 473, 481. But there nevertheless remain boundaries which can be mapped with some degree of definiteness. To reduce the obligations of debtors on judgments in personam cannot be said to be an exercise of the police power. The Mortgage Deficiency Judgment Act does not prevent foreclosures or the taking of possession by mortgagees; it does not affect physical living conditions. It is not in any sense, therefore, analogous to the legislation involved in the rent cases,[15] which

---

[15] *Block v. Hirsh*, 256 U. S. 135; *Marcus Brown Co. v. Feldman*, 256 U. S. 170; *Edgar A. Levy Leasing Co. v. Siegel*, 258 U. S. 242; *Chastleton Corp. v. Sinclair*, 264 U. S. 543.

dealt with the housing shortage immediately following the world war.[16]    Where large portions of the population are deprived of habitations the public health may well be endangered.    But the Mortgage Deficiency Judgment Act does not fall into such a category.    As a matter of fact instances are not likely to be numerous in which a debtor suffers mortgaged property to be bid in at a nominal price if he is financially responsible and the amount of a deficiency judgment against him is therefore a matter of practical concern.    Indeed the bidding in of property at sheriff's sales for a trifling sum is not a practice of recent origin.    The real evil created by the depression has not been the actual or potential enforcement by mortgagees of deficiency judgments, but the increased number of foreclosures due to inability of mortgagors to meet the terms of their indebtedness.

If it seem harsh in a period of economic adversity to deny to the state the power to give relief to debtors even though to some extent contractual obligations may thereby be impaired, it must be remembered that the chief purpose of the constitutional prohibition was to protect the integrity of contracts especially in those times when the temptation to yield to a policy of repudiation might be intensified by an era of financial depression.    A careful reading of American history covering the period of the articles of confederation reveals the fact that it was the practice by the states, at that time of grave economic distress, of enacting repudiatory legislation,—in some instances treating creditors as veritable outlaws,[17]—that led to the insertion in the constitution of the clause against the impairment of contracts.

---

[16] Neither, for the same reason, is it similar to the Acts of May 18, 1933, P. L. 826, and March 27, 1935, P. L. 7, which were designed to stay evictions from dwelling houses.

[17] Fisher Ames, "Eulogy on Washington," Works, ed. of 1809, p. 120.

That clause did much to restore public and private confidence and reinvigorate commercial intercourse.[18]

While a court faced with the task of interpreting the constitution should do so in the broad spirit appropriate to the generality and permanency of that instrument, and while it should also be realistic in facing current conditions, it would be recreant to its duty if it sanctioned the whittling away of constitutional restrictions because of a belief, however well-founded, in the temporary desirability of such action. Whatever validity the Mortgage Deficiency Judgment Act of 1934 may have as to mortgages executed after its passage, it is violative both of the federal and state constitutions when applied to the contractual rights of plaintiff in the present case.

The order of the court below dismissing plaintiff's petition to strike off the satisfaction entered upon its judgment against defendants is reversed; the rule is reinstated and is herewith made absolute.

CONCURRING OPINION BY MR. CHIEF JUSTICE KEPHART:

I concur in the result reached by the majority. It is true that the Mortgage Deficiency Judgment Act was passed in relief of mortgage debtors and that it should not be set aside unless clearly violative of a constitutional provision. That the act does conflict with the fundamental law, however, is conclusively demonstrated in the majority opinion. Unless we are to subject all contracts to legislative control or supervision the act must fall. This result does not, in my judgment, prevent mortgage debtors from securing substantial relief in another form of procedure equally as beneficial as that provided by the act in question. Appellee's counsel could have petitioned the court below to set aside the sheriff's

---

[18] See opinion of Mr. Justice SWAYNE in *Edwards v. Kearzey*, 96 U. S. 595, 604 et seq., and dissenting opinion of Mr. Justice SUTHERLAND in *Home Building & Loan Association v. Blaisdell*, 290 U. S. 398, 453 et seq.

sale for gross inadequacy in price such as would in law amount to a fraud on the debtor's right. While mere inadequacy in price where there is competitive bidding would not be sufficient to cause the court to act *(Cake v. Cake,* 156 Pa. 47; *Nutt v. Berlin S. C. & C. M. Co.,* 262 Pa. 417; *Schekter v. Katler,* 95 Pa. Superior Ct. 226), gross inadequacy amounting to a legal fraud would be sufficient. Upon such a petition the evidence would disclose the true value of the property and the court could order a resale, fixing, if necessary, an upset price. This practice has been frequently followed in equity, and as the court below is administering equitable principles through common law forms there would seem to be no reason why counsel should not have availed himself of this procedure. It would require quite a stretch of the imagination to contend that $900, the proceeds of the sale of a property worth $14,000, was not grossly inadequate, and, because of stringent economic conditions, a fraud on the debtor's right. As stated in *Delaware County National Bank v. Miller,* 303 Pa. 1, 6, where the equity in properties was worth $69,200 and was sold for $2,000: "It has often been said that this [setting aside a sheriff's sale] will not be done for a mere inadequacy of price, without more; but no case goes so far as to say that a chancellor must confirm a sale where the inadequacy is so great as to shock his conscience, as would be the case here. After all, the ultimate test always is, whether or not the action of the court in setting aside the sale was a gross abuse of discretion *(Stroupe v. Raymond,* 183 Pa. 279, 281; *Chase v. Fisher,* 239 Pa. 545, 548; *Lefever v. Kline,* 294 Pa. 22), and he would be a strange student of the law who could conclude that a chancellor grossly abused his discretion by refusing to do that which would have shocked his conscience." The setting aside or the refusal to set aside a sheriff's sale is within the sound discretion of the court below *(Snyder v. Snyder,* 244 Pa. 331; *Watkins v. Justice (No. 1),* 256

Pa. 37; *Lefever v. Kline,* supra; *Schekter v. Katler,* supra, and cases there cited), and it should be exercised without hesitation whenever necessary to avoid the possibility of injustice to a mortgage debtor.

DISSENTING OPINION BY MR. JUSTICE BARNES:

I dissent from the opinion of the majority. I would hold valid the legislation here in question. The majority opinion makes it appear that this legislation is an impairment of the obligation of contract in violation of the Federal Constitution, and that it contravenes provisions of the State Constitution. An analysis of the provisions of the Act leads me to the opposite conclusion. The Mortgage Deficiency Judgment Act of January 17, 1934, P. L. 243, here in question, does not impair any substantive contractual rights of the mortgagee. The mortgagor's obligation to pay the full amount of the debt is in no way impaired, changed or altered. He remains fully liable therefor. In case of default, the mortgagee may foreclose and proceed to realize the principal sum, plus interest and costs, just as before the Act. The payment of the debt is not postponed one day. All that the Act does is to require the mortgagee to establish and give credit for the "fair value" of the mortgaged premises, before he can proceed against other property of the debtor. As this Court said, speaking of the legislative intent in the passage of this very Act, in *Evans* v. *Provident Trust Company,* 319 Pa. 50, 52: "The purpose of the Act is to assure in the interest of a defendant mortgagor, a credit on the judgment according to the fair value of the property bought in by the mortgagee, regardless of the amount bid, very often, a nominal amount." The mortgagee may still obtain a deficiency judgment for any amount by which the principal debt, plus interest and costs, exceeds this "fair value" of the property. The Act merely puts into effect, in times of great economic stress, equitable principles

which have long been recognized in the foreclosure of mortgages.

Prior to the enactment of this statute the purpose of the sheriff's sale was to realize by competitive bidding the fair value of the mortgaged premises. The amount so realized was always in relief of or deducted from the judgment. Due to the conditions of the present time there were no purchasers desiring to buy at sheriff's sales and competitive bidding almost completely disappeared. Solely for the purpose of affording a remedy for this situation the Legislature passed this Act. When its provisions are examined closely it is to be seen that a procedural change only is brought about by the requirement that "the plaintiff . . . shall . . . petition the court out of which such writ of execution issued to fix the fair value of the property sold," and to deduct the amount of such fair value from the amount of the judgment, interest and costs before a deficiency judgment may be entered for the balance. It is difficult to understand how it can be declared that this provision goes beyond a mere change in procedure upon the foreclosure of a mortgage. Certainly it cannot be held that the mortgagee has a substantive right, by virtue of the mortgage contract or otherwise, to buy in the property for a nominal or grossly inadequate sum.

The statute here is intended to regulate the remedy for the enforcement of the obligation, and not to impair the obligation itself. We have consistently held that a statute which affects remedial processes only does not impair contractual obligations: *West Arch B. & L. A. v. Nichols,* 303 Pa. 434. The present Chief Justice in the case cited (where was involved the constitutionality of the Act of May 6, 1929, P. L. 1557, permitting the sale of real estate without inquisition) thus stated the principle, (p. 440) : "The Act does not violate the constitutional inhibition against impairing the obligations of contracts. It changes the mode of procedure or the remedy by eliminating a part of the requisites." He said

(quoting from *King v. The Security Co.*, 241 Pa. 547) :
"No person has a vested right in any course of proced-
ure, nor in the power of delaying justice, or of deriving
benefit from technical and formal matters of pleading
. . . *and if a statute alters that mode of procedure, he
has no other right than to proceed according to the al-
tered mode.*"

It is well recognized that the State possesses control
over remedial processes, and may make changes in meth-
ods of procedure without violating the contract clause of
the federal constitution. As Mr. Justice HUGHES pointed
out in *Home B. & L. Assn. v. Blaisdell,* 290 U. S. 398,
quoting from an earlier case (p. 433) : "The general
doctrine of this court on this subject may be thus stated:
In modes of proceeding and forms to enforce the con-
tract the legislature has the control, and may enlarge,
limit or alter them, provided it does not deny a remedy
or so embarrass it with conditions or restrictions as
seriously to impair the value of the right."

Again to make clear my position, it seems to me that
this Act is not in derogation of substantial contractual
rights, as the majority opinion holds. It merely estab-
lishes, as a temporary expedient, during a period of
great economic stress, a change in the method of pro-
cedure to collect a mortgage debt. The Act is designed
to meet the necessities of a declared emergency to pre-
vent the sacrifice of real property throughout the state
at mortgage foreclosure sales. History supplies ample
precedents in the laws of this state and the decisions of
this Court for the enactment and validity of such reme-
dial measures in times of urgent public need. For ex-
ample, during the crisis and collapse of the credit system
in 1842, the legislature passed an act which prohibited
for a time sheriff's sales of property for less than two-
thirds of its appraised value. The Act (July 16, 1842,
P. L. 407) provided that lands taken in execution should
be valued and appraised by an inquest of twelve men
summoned by the sheriff or coroner; that such valuation

or appraisement should be conclusive, and that when "the same cannot be sold at public vendue or outcry *for two-thirds or more of such valuation or appraisement,* that then, and in such case the sheriff or coroner shall not make sale of the premises, but shall make return of the same accordingly to the court from which the execution issued, and that thereupon all further proceedings for the sale of such lands, tenements, or hereditaments shall be stayed for one year from and after the return day."

The constitutionality of this Act of 1842 came before this Court in the case of *Chadwick v. Moore,* 8 W. & S. 49, where the Act was upheld in an opinion delivered by Chief Justice GIBSON. He said (p. 52) : "To hold that a State Legislature is incompetent to relieve the public from the pressure of sudden distress by arresting a general sacrifice of property by the machinery of the law, would invalidate many statutes whose constitutionality has hitherto been unsuspected."

In this State we have for several hundred years proceeded upon the theory that the real purpose of a public sale in connection with a mortgage foreclosure proceeding is to arrive at the fair value of the mortgaged property. But what is meant by the expression "the fair value of the property"? Recently we defined the meaning of "fair value" as used in this very Act when we said in *Market Street National Bank v. Huff,* 319 Pa. 286, 288, that it was "such sum as the property will sell for to a purchaser desiring to buy, the owner wishing to sell; such a price as a capable and diligent business man could presently obtain from the property after conferring with those accustomed to buy such property; *the amount the property would bring at a sale on execution shown to have been in all respects fair and reasonable;* the fair market value of the property as between one who wants to purchase and one who wants to sell the property."

As pointed out above, in normal times the amount the mortgaged property would bring at public vendue or outcry was, as this Court said, "in all respects fair and reasonable," and the method of sale by the sheriff was equitable alike to mortgagor and mortgagee. Unfortunately this method as a means of determining fair value has completely broken down. Sheriff's sales have been attended principally by the attorneys for the execution plaintiffs, and they have bid in the property for costs and taxes. In the case of *Market Street National Bank v. Huff*, supra, it appears from the opinion of the court below, as found in 21 D. & C. 157, that the real estate in question was sold to the attorney on the writ for the sum of $50.00. The court found that the fair value of the premises was $28,727.00. The method of determining the value by a sheriff's sale having temporarily proved inadequate due to the extraordinary economic situation, in its place the Act has substituted the deliberate judgment of the court as to the fair value of the property *to tide over the emergency.*

That the Legislature, in the exercise of the sovereign power of the state, has authority to meet the public need by the present statute, which is reasonable and appropriate to the emergency, seems to me too clear for argument. To permit the mortgagee to take advantage of distressing conditions, when a sale is really no sale at all, is contrary to all legal and equitable principles.

This Court recognized the inequity to which I refer when it said in *White's Estate*, 322 Pa. 85, 90: where the mortgaged premises had been sold for $50.00 at sheriff's sale on August 4, 1930, at the beginning of the present financial crisis, and the balance of the obligation reduced to a personal judgment, "This is indeed a harsh situation and an attempt has been made to afford a remedy in such cases by the provisions of the Act of January 17, 1934, P. L. 243, and those of the Act of July 1, 1935, P. L. 503. Unfortunately for this estate the rights of

the parties had become fixed prior to the passage of the Acts mentioned."

The foundation upon which this legislation rests is that it is expressly intended, as such measures in the past have been, as *emergency legislation*. This view finds support in the words of Mr. Chief Justice HUGHES in the *Blaisdell case*, supra, at page 439, where he said: "And if the state power exists to give temporary relief from the enforcement of contracts in the presence of disasters due to physical causes such as fire, flood or earthquake, that power cannot be said to be non-existent when the urgent public need demanding such relief is produced *by other and economic causes.*"

It cannot, then, with reason be asserted that the act in question is unconstitutional because the state lacks the power to provide for the temporary relief of mortgage debtors to the extent that the mortgagee must give adequate credit for what he has already taken before proceeding against other property of the mortgagor. The Supreme Court of the United States recently held that the state possessed such reserve power, which, as I see it, is the power to protect the vital interests of its citizens against the state-wide sacrifice of real estate, the destruction of all real estate values, and the financial disaster inevitably involved in oppressive outstanding deficiency judgments. In *W. B. Worthen v. Thomas*, 292 U. S. 426, 432, the Court said: "We held in *Home Building and Loan Assn. v. Blaisdell* [supra] that the constitutional prohibition against the impairment of the obligation of contracts did not make it impossible for the state, in the exercise of its essential reserved power, to protect the vital interests of its people. The exercise of that reserved power has repeatedly been sustained by this court as against a literalism in the construction of the contract clause which would make it destructive of the public interest by depriving the state of its prerogative of self protection."

It seems to me that the Act in question should be placed in the same category with those Acts of Congress and laws of other states which have been sustained by reason of the emergency character of the legislation. I need only refer to a few of these, such as the so-called "rent cases" *(Block v. Hirsh,* 256 U. S. 135; *Marcus Brown Hold. Co. v. Feldman,* 256 U. S. 170) ; the "gold clause" case *(Norman v. Baltimore & Ohio R. R. Co.,* 294 U. S. 240) ; the Minnesota mortgage moratorium law *(Blaisdell* case, supra).

In most of the cases cited in the majority opinion, wherein the various state Deficiency Judgment Acts were held unconstitutional, the Acts were more drastic and unreasonable in their provisions than is the Act now before us. In *Adams v. Spillyards,* 61 S. W. (2d) 686, 187 Ark. 641, the statute of Arkansas in effect abolished deficiency judgments by providing that the mortgaged property should be considered to be of the value of the loan without regard to the amount realized at the foreclosure sale. In *Vanderbilt v. Brunton Piano Co.,* 169 A. 177, 111 N. J. Law 596, and *Langever v. Miller,* 76 S. W. (2d) 1025, 124 Tex. 80, it clearly appears from the opinions that the Acts considered were not passed as emergency legislation nor limited in their duration. In *Atlantic Loan Co. v. Peterson,* 182 S. E. 15, 181 Ga. 266, the Court points out that the Georgia statute does not purport to be emergency legislation, and therefore, expressly refrained from deciding whether or not emergency legislation limited to a definite period might be sustained as constitutional. In *Kresos v. White,* 54 Pac. (2d) 800, the Arizona Act was more stringent in its provisions than our Pennsylvania Act, and, as the Court says in its opinion (p. 801), "The practical effect of this statute is to do away with deficiency judgments."

These cases construing Acts so different in their provisions from the one now before us, are not analogous, nor are they at all authoritative on the question here involved. At least they should not be followed by this

522

Court. However, in New York, in the case of *Klinke v. Samuels*, 190 N. E. 324, 264 N. Y. 144, a statute almost identical in substance with the Pennsylvania Act was held constitutional, the Court citing and relying upon the decision of the United States Supreme Court in the *Blaisdell* case, supra.

I am strongly opposed to what has been referred to as a "literalism in the construction of the contract clause" of the Constitution where emergency conditions make necessary a relief measure of the character of this legislation. I would sustain the constitutionality, both state and federal, of the Act in question.