LAWYERS TRUST COMPANY, as Nominee under a Certain Agreement Bearing Date November 19, 1931, between KINGSWAY REALTY AND MORTGAGE CORPORATION and Others, Plaintiff, v. KINGSWAY REALTY AND MORTGAGE CORPORATION, Formerly Known as KINGSWAY REALTY CORPORATION, and Others, Defendants.

Supreme Court, Kings County, January 28, 1937.

Lewis, Marks & Kanter [Lloyd B. Kanter of counsel], for the plaintiff.

Philip J. Termini, for the defendants.

BONYNGE, J.   Upon this motion for a deficiency. judgment the plaintiff challenges the constitutionality of section 1083-a of the Civil Practice Act.   It assumes that this question has not been passed upon by the Court of Appeals.   (*New York Life Ins. Co.* v. *Guttag Corp.*, 265 N. Y. 292.)   The assumption is erroneous. By a succession of recent decisions our courts have attempted to lay this vital constitutional and economic issue at rest, without discussion or elucidation of any kind.   (*Honeyman* v. *Hanan*, N. Y. L. J. June 26, 1935, p. 3298; affd., 246 App. Div. 781; affd., 271 N. Y. 564.)   It was not until the plaintiff in that case sought to pave the way for an appeal to the court of last resort that there was any inkling of what had been decided.   In granting a motion to amend its remittitur the Court of Appeals said (271 N. Y. 662): " Motion to amend remittitur granted.   Return of remittitur requested and when returned it will be amended by adding thereto the following: ' A question under  the Federal Constitution was presented and necessarily passed upon by this court.   The plaintiff contended that chapter 794 of the Laws of the State of New York, enacted in 1933, as amended (Sections 1083-a and 1083-b of Civil Practice Act), impair the obligations of contracts, and thus violate article 1, section 10, of the Constitution of the United States.   This court held that such laws do not violate said provision of article 1, section 10, of the Constitution of the United States.' "

The appeal was lately argued before the United States Supreme Court and is now under advisement.   It would be sheer effrontery to speculate as to the outcome.

The decision of the Court of Appeals was handed down on May 19, 1936, and related to a condition of affairs in the spring of 1935 or earlier.   Five months later the Supreme Court of Pennsylvania declared a similar law in that State unconstitutional.   (*Beaver County Building & Loan Assn.* v. *Winowich*, 323 Penn. St. 483; 187 A. 481.)   The learned and exhaustive opinions in that case will well repay reading.   After a full review of Federal and State decisions, STERN, J., thus describes the attitude of the courts of New York: " New York is apparently the only State which has sustained the validity of a mortgage deficiency judgment act similar to the Pennsylvania statute.   The act temporarily stayed foreclosures and suits to recover the mortgage indebtedness if interest and taxes were paid.   It also provided for a deficiency judgment to be fixed at the time of confirmation of the sale, allowing a credit for the market value of the property as determined by the court, or the sale price, whichever might be the higher. In actions to recover the indebtedness secured by the mortgage,

the debtor was to be allowed to set off the ' fair and reasonable market value ' of the property. In a brief opinion on the question of constitutionality, unsupported by any citation of authorities, the court upheld the act. ( *Klinke* v. *Samuels*, 264 **N. Y.** 144; 190 **N. E.** 324.) "

The temptation to quote other passages from the same wholesome opinion cannot be resisted. Thus (187 A. 481, at p. 493), the court says: " A plea of justification as emergency legislation is invoked in defence of the statute. It is urged that the exigencies of the times require a certain degree of obliviousness to the mandates of the Constitution and to the decisions which have construed them. Under our constitutional system, however, emergency cannot create a power nor diminish restrictions. *Ex Parte Milligan*, 4 Wall. 2, 120, 121; 18 L. Ed. 281; *Wilson* v. *New*, 243 U. S. 332, 348; 37 S. Ct. 298; 61 L. Ed. 755; L. R. A. 1917E, 938; Ann. Cas. 1918A, 1024; *Home Building & Loan Association* v. *Blaisdell*, 290 U. S. 398, 425, 426; 54 S. Ct. 231, 235; 78 L. Ed. 413; 88 A. L. R. 1481; *A.L.A.Schechter Poultry Corp.* v. *United States*, 295 U.S. 495, 528, 529; 55 S. Ct. 837, 842; 79 L. Ed. 1570; 97 A. L. R. 947. A necessity that is higher than the Constitution can have no place in American jurisprudence; it can be met only by constitutional amendment. ' No doctrine,' said the court in *Ex Parte Milligan*, 4 Wall. 2, 121; 18 L. Ed. 281, ' involving more pernicious consequences, was ever invented by the wit of man than that any of its [the Constitution's] provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism.' "

And again (187 A. 481, at p. 494) we find this paragraph springing from a sound knowledge of American history: " If it seem harsh in a period of economic adversity to deny to the State the power to give relief to debtors even though to some extent contractual obligations may thereby be impaired, it must be remembered that the chief purpose of the constitutional prohibition was to protect the integrity of contracts, especially in those times when the temptation to yield to a policy of repudiation might be intensified by an era of financial depression. A careful reading of American history covering the period of the Articles of Confederation reveals the fact that it was the practice by the States, at that time of grave economic distress, of enacting repudiatory legislation, in some instances treating creditors as veritable outlaws (Fisher Ames, Eulogy on Washington, Works, Ed. of 1809, p. 120) that led to the insertion in the Constitution of the clause against the impairment of contracts. That clause did much to restore public and private confidence and reinvigorate commercial inter-

course. (See opinion of Mr. Justice SWAYNE in *Edwards* v. *Kearzey*, 96 U. S. 595, 604 *et seq.;* 24 L. Ed. 793, and dissenting opinion of Mr. Justice SUTHERLAND in *Home Building & Loan Association* v. *Blaisdell*, 290 U. S. 398, 453, *et seq.;* 54 S. Ct. 231, 245; 78 L. Ed. 413; 88 A. L. R. 1481.) "

Assuming that section 1083-a of the Civil Practice Act was constitutional in June, 1935, does it necessarily follow that it is constitutional today? The Court of Appeals has declared that such legislation to be valid must be "reasonably seeking only temporary relief." (*Klinke* v. *Samuels*, 264 N. Y. 144, at p. 149.) The background of section 1083-a requires study to judge whether the suspension of constitutional guaranties can longer be said to be reasonable. That section was enacted in 1933 under the stress of most unusual economic conditions. In one of those high-sounding, fact-finding preambles which have become increasingly common in recent years, the Legislature declared that there was a "serious public emergency" and that it would last until July 1, 1934. In each succeeding year it has enacted that the emergency would persist for about fifteen months longer. It is now solemnly considering whether to hazard another guess that the period of convalescence will extend to July 1, 1938.

No one can deny the fact that this and companion legislation have been a boon to distressed mortgagors. Tens of thousands of homes or other realty investments of thrifty, deserving people have been saved from the auction block and their gratitude should know no bounds. However, like all public questions, this one very distinctly has another side. Not every mortgage or mortgage certificate is owned by either a soulless corporation or a heartless Shylock. For generations they have been the favored investment of widows, orphans, elderly couples of slender means, estates, hospitals, schools, savings banks and others who bear not the slightest resemblance to "money changers in the temple" or "economic royalists." Upon them this legislation operates most harshly. In the first place, it is a mistake to assume that every mortgagor is a poor, humble and deserving home owner. Droves of them are the most unblushing rogues and chiselers in the land. Today they are in the saddle and dictate practically their own terms to the luckless mortgagees, irrespective of their ability to pay. In the second place, the virtual freezing of all mortgage capital has given impetus to a new racket of immense proportions. Every owner of a mortgage or mortgage certificate is continuously being solicited by mail and advertisement to part with his investment at a mere fraction of its actual value. All too many are unable to hold on until a better day has dawned and, as a con-

sequence, the scalpers have harvested a goodly crop. Finally, it is nothing short of confiscation to peg all mortgage investments at fixed amounts and decree that they must remain there indefinitely. Buildings deteriorate at the rate of from two to five per cent per annum, depending upon age and construction. It is safe to assert that, except in those unusual cases where the value of the land has appreciated, the actual security under most mortgages is today only eighty to ninety per cent of what it was in 1933. Manifestly this cannot continue unless all constitutional guaranties are to be discarded. (*Klinke* v. *Samuels*, 264 N. Y. 144.)

Does the " serious public emergency," not discovered or declared until nearly four years after the panic, still continue, and if so, does it outweigh the plight of the mortgagees who must helplessly watch the steady decline of the values of their investments? Today these questions have become the football of politics. The borrowers are more numerous and more vocal than the lenders and hence the situation is charged with political dynamite. In such a dilemma where should one look for the forthright courage to end the mortgage moratorium (if it should be ended) — to the judges whose tenure of office is practically for life, or to the legislators who must seek the approval of their constituents either annually or every second year? The question provides ample food for thought, especially since the Federal and State Constitutions bear equally upon the legislative and the judicial departments of the government.

The present application for a deficiency judgment presents factual issues which cannot be determined upon affidavits. The same will be referred to Hon. Isaac M. Kapper, as official referee, to take testimony and report, with his opinion, upon the following questions of fact:

*First.* Does the " serious public emergency " declared by the Legislature in the years 1933, 1934, 1935 and 1936, still exist as a matter of fact?

*Second.* Assuming section 1083-a of the Civil Practice Act to be constitutional and still in effect, what is the amount of the deficiency judgment, if any, to which the plaintiff is entitled?

The motion will be held under advisement until the coming in of the referee's report. Settle order on notice.